No. 03-3802

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

RECORDING INDUSTRY ASSOCIATION OF AMERICA,

Appellee,

v.

CHARTER COMMUNICATIONS, INC.,

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
HON. CAROL E. JACKSON, CHIEF UNITED STATES DISTRICT JUDGE

**BRIEF OF *AMICI CURIAE* MOTION PICTURE ASSOCIATION OF AMERICA, INC.,
ASSOCIATION OF AMERICAN PUBLISHERS, ASSOCIATION FOR INDEPENDENT
MUSIC, AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND
CANADA, AFMA, AMERICAN FEDERATION OF TELEVISION AND RADIO
ARTISTS, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., THE
AUTHORS GUILD, INC., BROADCAST MUSIC, INC., BUSINESS SOFTWARE
ALLIANCE, THE CHURCH MUSIC PUBLISHERS ASSOCIATION, DIRECTORS
GUILD OF AMERICA, INC., ENTERTAINMENT SOFTWARE ASSOCIATION,
GRAPHIC ARTISTS GUILD, INC., OFFICE OF THE COMMISSIONER OF
BASEBALL, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, RECORDING
ARTISTS COALITION, SCREEN ACTORS GUILD, INC., SESAC, INC., THE
SONGWRITERS GUILD OF AMERICA, SOFTWARE & INFORMATION INDUSTRY
ASSOCIATION, AND WRITERS GUILD OF AMERICA, WEST, INC.
IN SUPPORT OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA
AND URGING AFFIRMANCE**

Paul B. Gaffney
Manish K. Mital
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
*Counsel for Motion Picture
Association of America, Inc.*

Eric J. Schwartz
SMITH & METALITZ LLP
1747 Pennsylvania Avenue, N.W.
Suite 825
Washington, D.C. 20006
(202) 833-4198
*Counsel for all Amici Curiae*

# FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies as follows:

*Amicus* Motion Picture Association of America, Inc. is a not-for-profit trade association that serves as the voice and advocate of the major American motion picture studios. The MPAA has no parent corporation. The MPAA has no stock and hence no shareholders.

*Amicus* Association of American Publishers is the national trade association of the U.S. book publishing industry. AAP has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Association for Independent Music is a national trade organization that represents independent record labels and is dedicated to the vitality of the independent music community. AFIM has no parent corporation, and has no stock and hence no shareholders.

*Amicus* American Federation of Musicians of the United States and Canada is an international labor organization representing over 100,000 professional musicians who give live performances and who record music for the recording, motion picture, television, radio and advertising industries. It is organized as a nonprofit mutual benefit corporation under the Nonprofit Mutual

Benefit Corporation Law of the State of California.  AFM has no parent corporation, and has no stock and hence no shareholders.

*Amicus* AFMA (formerly known as the American Film Marketing Association) is a trade association representing more than 150 independent producers and distributors of motion pictures and television programming.  AFMA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* American Federation of Television and Radio Artists is a national labor union representing approximately 80,000 performers and newspersons who are employed in the news, entertainment, advertising, and sound recording industries.  AFTRA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* American Society of Media Photographers, Inc. is a trade association that was founded in 1944 to protect and promote the interests of professional photographers who earn their livings by making photographs for publication in the various media.  ASMP has no parent corporation, and has no stock and hence no shareholders.

*Amicus* The Authors Guild, Inc., a non-profit membership organization of published writers, is a corporate member of the Authors League of America.  Neither the Authors Guild nor the Authors League has stock and hence they have no shareholders.

*Amicus* Broadcast Music, Inc. represents approximately 300,000 songwriters, composers, and music publishers. Broadcast Music, Inc. has no parent corporation. The only publicly held company that directly or indirectly owns 10% or more of its stock is Gannett Co., Inc., through an indirect, wholly owned subsidary.

*Amicus* Business Software Alliance represents the world's commercial software industry. BSA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* The Church Music Publishers Association has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Directors Guild of America, Inc. is a nonprofit corporation that serves as the duly recognized labor organization and exclusive representative for the purposes of collective bargaining of, among others, directors, assistant directors, and unit production managers of theatrical and television motion pictures. DGA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Entertainment Software Association has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Graphic Artists Guild, Inc. is a Not-For-Profit Corporation that serves as the duly recognized national labor union for illustrators, designers,

web creators, production artists, surface designers, and other creatives who have come together to pursue a common goal of raising industry standards of service to the public, of using all legal means to improve conditions of work, and of promoting, protecting and furthering the mutual interest of members employed in the production of original creative works of art intended for graphic presentation either as originals or reproductions.  GAG has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Office of the Commissioner of Baseball represents the thirty clubs engaged in the professional sport of Major League Baseball, who own copyrights in the broadcasts of more than 2,000 Major League Baseball games played each year.  The Office of the Commissioner of Baseball has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Professional Photographers of America, the world's largest photographic trade association, represents photographers and photographic artists from dozens of specialty areas including portrait, wedding, commercial, advertising, and art.  PPA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Recording Artists Coalition is a nonprofit, non-partisan coalition formed to represent the interests of recording artists in public policy

debates that affect the music industry. RAC has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Screen Actors Guild, Inc. is the collective bargaining representative for over 96,000 professional actors and performing artists, including dancers, singers, and stunt performers, in the theatrical and television motion picture industry. SAG has no parent corporation, and has no stock and hence no shareholders.

*Amicus* SESAC, Inc. has no parent corporation and no publicly held corporation owns 10% or more of SESAC, Inc.

*Amicus* The Songwriters Guild of America, the nation's oldest and largest organization run exclusively by and for songwriters, is an unincorporated voluntary membership association. SGA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Software & Information Industry Association is a leading trade association committed to promoting and protecting the interests of the software and information industries. SIIA has no parent corporation, and has no stock and hence no shareholders.

*Amicus* Writers Guild of America, west, Inc. is a labor organization representing approximately 8,500 professional authors of stories and scripts for

theatrical and television motion pictures.  WGA has no parent corporation, and has

no stock and hence no shareholders.

# TABLE OF CONTENTS

**Page**

FRAP 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF CONTENTS........................................................................... vii

TABLE OF AUTHORITIES ................................................................. viii

STATEMENT OF THE CASE.................................................................1

INTEREST OF AMICI ..........................................................................2

ARGUMENT ........................................................................................8

I.    THE ISP INDUSTRY SEEKS TO ESCAPE ITS OBLIGATIONS UNDER THE COMPROMISE LEGISLATION IT URGED CONGRESS TO ENACT.................................................................8

II.   COPYRIGHT INFRINGERS WHO UTILIZE PEER-TO-PEER SYSTEMS ARE SUBJECT TO SECTION 512(H) SUBPOENAS.............18

III.  CONGRESS WAS ENTITLED TO BALANCE, AND PROPERLY BALANCED, THE COMPETING INTERESTS OF INTERNET USERS AND COPYRIGHT OWNERS...................................22

CONCLUSION .....................................................................................30

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001)................................................................16, 17

*In re Aimster Copyright Litigation*,
    334 F.3d 643 (7th Cir. 2003), cert. denied, 124 S. Ct. 1069 (2004).. 16, 17, 24

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987).....................................................................................29

*America Federal of Government Employees v. Pierce*,
    697 F.2d 303 (D.C. Cir. 1982) ....................................................................29

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002).....................................................................................28

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)...............................................................................24, 29

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982).....................................................................................21

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985)................................................................................ 22-23

*Henderson v. Kennedy*,
    253 F.3d 12 (D.C. Cir. 2001), cert. denied, 535 U.S. 986 (2002) .................29

*Mazer v. Stein*,
    347 U.S. 201, 219 (1954) ............................................................................23

*Members of City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984).....................................................................................28

*Metropolitan-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*,
    259 F. Supp. 2d 1029 (C.D. Cal. 2003) ................................................16, 17

*Monahan v. Flannery,*
    755 F.2d 678 (8th Cir. 1985)........................................................................21

*Recording Industry Association of America v. Verizon Internet Services, Inc.,*
    351 F.3d 1229 (D.C. Cir. 2003) .............................................................19, 24

*Rowley v. Yarnall*,
    22 F.3d 190 (8th Cir. 1994)..........................................................................21

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) .....................................................1, 14

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ...........................................................................9

*In re Verizon Internet Services, Inc.*,
    240 F. Supp. 2d 24 (D.D.C. 2003)....................................................20, 26, 29

*In re Verizon Internet Services, Inc.*,
    257 F. Supp. 2d 244 (D.D.C. 2003)...........................................20, 24, 27, 28

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................................28

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*,
    536 U.S. 150 (2002)......................................................................................23

## FEDERAL STATUTES AND RULES

17 U.S.C. § 512(h) ................................................................. *passim*

Online Copyright Infringement Liability Limitation Act, Digital Millennium
    Copyright Act, Pub. L. No. 105-304, § 201, 112 Stat. 2860, 2877
    (1998)..............................................................................................................9

# LEGISLATIVE HISTORY

144 Cong. Rec. H7074, H7081 ...............................................................14

144 Cong. Rec. H7092 .........................................................................23

144 Cong. Rec. S4884 ..........................................................................23

H.R. Rep. No. 105-551 (Amended) ...........................................9, 14, 23

S. Rep. No. 105-190 ...............................................9, 12, 13, 14, 23

*WIPO Copyright Treaties Implementation Act and Online Copyright
    Liability Limitation Act: Hearing on* H.R. *2281 and 2280 Before the
    Subcomm. on Courts and Intellectual Property of the House Comm. on
    the Judiciary*, 105th Cong. 22-25 (1997) ................................. *passim*

*WIPO Copyright Treaties Implementation Act: Hearing on H.R. 2281 Before
    the Subcomm. on Telecommunications, Trade and Consumer Protection
    of the House Comm. on Commerce,*
    105th Cong. 50-52 (1998) ..................................................13, 14, 15

*The Copyright Infringement Liability of Online and Internet Service
    Providers: Hearing on S. 1146 Before the Senate Comm. on the
    Judiciary*, 105th Cong. 45-55 (1997) ...................................... *passim*

## OTHER AUTHORITIES

John Borland, *File swapping shifts up a gear*, CNETNews.com, May 27,
    2003, *available at* http://news.com.com/2100-1026-1009742.html ..................17

Memorandum from John B. Horrigan, *Adoption of Broadband to the Home:
    A Pew Internet Project Data Memo*, 1 (May 18, 2003) *available at*
    http://www.pewinternet.org/reports/pdfs/PIP_Broadband_adoption.pdf ...........17

Press release, KaZaa, *Kazaa Media Desktop sets most downloaded software
    record*, (May 26, 2003), *available at*
    http://www.kazaa.com/us/news/most_downloaded.htm (May 26, 2003)......... 17

Mary Madden, *America's Online Pursuits: The Changing Picture of Who's Online and What They Do*, 3 (Dec. 22, 2003) *available at* http://www.pewinternet.org/reports/pdfs/PIP_Online_Pursuits_Final.........17-18

Memorandum from Mary Madden and Amanda Lenhart, *Music Downloading, File-sharing, and Copyright: A Pew Internet Project Data Memo*, 1, 5 (July 31, 2003) *available at* http://www.pewinternet.org/reports/pdfs/PIP_Copyright_Memo.pdf................16

Roy Mark, *Boxer Blasts Verizon's DMCA Stance*, September 17, 2003, *available at* http://dc.internet.com/news/article.php/3079141 ..........................18

## STATEMENT OF THE CASE

Underlying this appeal is the aggravated copyright infringement of 93 customers of appellant Charter Communications, Inc. ("Charter"). Together these individuals made more than 100,000 copyrighted music recordings available for download over their Charter Internet connections. Each was utilizing one of the popular "peer-to-peer" Internet file-copying services that allow people to upload and download music and other copyrighted works and that, in the present state of the Internet, provide the largest opportunity for copyright theft. These individuals are known to Charter, but through the use of Internet aliases and pseudonyms, they are anonymous to everyone else, including the copyright owners who are victimized by this conduct. They are part of a wave of "copyright infringement" and "piracy of intellectual property over the Internet" that, courts have recognized, has "reached epidemic proportions." *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002).

On September 23, 2003, appellee Recording Industry Association of America ("RIAA"), acting on behalf of the victims of this infringement, served Charter with a subpoena pursuant to 17 U.S.C. § 512(h) requesting the identity of these individuals. The District Court overruled Charter's objection to the subpoena, and Charter has appealed, presenting this Court with the important question of whether and under what circumstances copyright owners may utilize

the Section 512(h) "Subpoena to identify infringer."  Charter and its supporting *amici*, many of whom urged Congress to enact this statute, now urge the Court to invalidate or at least preclude its use against "peer-to-peer" infringement.  This challenge should be rejected and the Minute Order of the District Court should be affirmed.

## INTEREST OF AMICI

The *amici curiae* who submit this brief include the principal victims of the Internet piracy "epidemic" that 17 U.S.C. § 512(h) was enacted to combat.

*Amicus* Motion Picture Association of America, Inc. ("MPAA") is a not-for-profit trade association that serves as the voice and advocate of the major American motion picture studios, all of which own famous intellectual property and rely heavily on state and federal laws for the protection of that property.  The MPAA works to protect the copyright interests of its members in numerous ways, including a comprehensive anti-piracy program on which tens of millions of dollars is spent annually.  Internet piracy in particular presents a grave and growing threat to the motion picture industry, which spends billions of dollars annually making and distributing motion pictures and other copyrighted programming worldwide.  Independent analysts estimate that between 400,000 and 600,000 times daily there is an unauthorized download of a copyrighted motion picture.

*Amicus* Association of American Publishers is the national trade association of the U.S. book publishing industry, whose members vigorously support free speech and strong intellectual property rights protection.

*Amicus* Association for Independent Music is a national trade organization that represents independent record labels and is dedicated to the vitality of the independent music community.

*Amicus* AFMA (formerly known as the American Film Marketing Association) is the trade association representing independent producers and distributors of motion pictures and television programming, as well as affiliated financial institutions that provide funding for independent production.

*Amici* American Society of Media Photographers, Inc. and Professional Photographers of America are trade associations that work to protect and promote the interests of professional photographers who earn their livings by making photographs for publication in the various media.

*Amicus* The Authors Guild is the nation's oldest and largest professional society of published authors, representing more than 8,500 writers.

*Amicus* Broadcast Music, Inc. represents approximately 300,000 songwriters, composers, and music publishers.

*Amicus* Business Software Alliance represents the world's commercial software industry before governments and in the international marketplace.

Online, BSA investigators identify over 100,000 instances of member-owned copyrighted programs offered for unauthorized downloading monthly.

*Amicus* Church Music Publishers Association is a 75-year old non-profit association that works on behalf of the interests of publishers of religious music.

*Amici* Directors Guild of America, Inc., Screen Actors Guild, Inc., Writers Guild of America, west, Inc., Graphic Artists Guild, Inc., American Federation of Television and Radio Artists, and American Federation of Musicians of the United States and Canada are labor organizations that collectively represent hundreds of thousands of individuals who earn a living in entertainment and the arts and whose compensation is tied inextricably to the protection of intellectual property rights and the prevention of unauthorized copying of the works that they create.

*Amicus* Entertainment Software Association is the U.S. trade association dedicated to serving the business and public affairs needs of companies that publish video games for game consoles, personal computers, handheld devices, and the Internet. The ESA works to protect the intellectual property interests of its members through, among other things, a worldwide anti-piracy program designed to combat piracy of entertainment software.

*Amicus* Office of the Commissioner of Baseball represents the thirty clubs engaged in the professional sport of Major League Baseball, who own copyrights in more than 4,000 telecasts each year.

*Amicus* Recording Artists Coalition is a nonprofit, non-partisan coalition formed to represent the interests of recording artists in public policy debates that affect the music industry. Members include Tony Bennett, Sheryl Crow, Don Henley, Billy Joel and Madonna.

*Amicus* SESAC, Inc., the second oldest of the United States performing rights organizations, was founded in 1930. SESAC, Inc., represents thousands of American songwriters, composers, lyricists and music publishers and more than a quarter of a million musical compositions. It licenses the non-dramatic public performance of such copyrighted compositions within its repertory and distributes to its affiliates the license fees paid by music users.

*Amicus* The Songwriters Guild of America ("SGA"), the nation's oldest and largest organization run exclusively by and for songwriters, is an unincorporated voluntary membership association. SGA has approximately 5,000 members, including the estates of more than 600 deceased songwriters throughout the country. SGA provides contract advice, royalty collection and audit services, copyright renewal assistance, and numerous other benefits to its members, in addition to educational programs and financial aid for beginning songwriters.

*Amicus* Software & Information Industry Association is a leading trade association committed to promoting and preserving the interests of the software and information industries.

Pursuant to Federal Rule of Appellate Procedure 29(a), counsel for *amici* have conferred with counsel for the principal parties in this case regarding the filing of this brief and certify that counsel for the RIAA and Charter have consented to the filing of this brief.

# SUMMARY OF ARGUMENT

The subpoena provision of Section 512 of the Digital Millennium Copyright Act of 1998 ("DMCA") is an important and powerful tool in the fight against the theft of valuable intellectual property over the Internet. This provision was enacted after months of deliberations by Congress, during which the Internet service provider ("ISP") industry agreed that combating Internet copyright piracy would require the joint effort of ISPs and copyright owners. Section 512(h) was enacted as a means by which ISPs would assist copyright owners in identifying infringers, an obligation that the ISP community agreed to undertake in exchange for limitations on their own liability for the infringements of their customers. Neither the language or legislative history of the statute supports the construction Charter and its *amici* now propose, under which their compliance with Section 512 subpoenas is required only in extremely narrow circumstances. Nor does any provision of Section 512 create or infringe on any First Amendment right to anonymity that Charter and its *amici* claim on behalf of ISP customers engaged in copyright infringement.

## ARGUMENT

### I. THE ISP INDUSTRY SEEKS TO ESCAPE ITS OBLIGATIONS UNDER THE COMPROMISE LEGISLATION IT URGED CONGRESS TO ENACT.

We are in the infancy of a networked, digital society. The early benefits of this transformation are obvious to anyone who has replaced his or her VCR with a DVD player, downloaded or updated software products over the Internet, or sampled and purchased music without visiting a record store. New and exciting online markets for distributing creative works are becoming a reality every day, and with advances in technology there will be benefits we have not yet imagined. But with these opportunities come real risks. The Internet and the inexpensive-yet-powerful computers that people use to access it are technological marvels, but copyright pirates have employed this technology to cause billions of dollars in harm to copyright owners. At no cost, and with just a few clicks of a mouse, these individuals can copy and disseminate on a global scale virtually perfect copies of digital works such as motion pictures, musical recordings, and software. Left unchecked, these copyright thieves threaten to destroy the legitimate digital marketplace for works of art, music, film, software, literature, and other video programming, and will deter the development and distribution of new works in state-of-the-art digital media.

The DMCA was Congress's response to the threat and the reality of digital piracy. In this landmark legislation Congress—with an eye toward creating incentives for the distribution of works in digital formats—provided the creative industries with reasonable and reliable procedural remedies that made the risks of digital copyright infringement more manageable. One of those remedies is contained in 17 U.S.C. § 512(h), which was enacted as part of Title II of the DMCA, separately titled the "Online Copyright Infringement Liability Limitation Act," Digital Millennium Copyright Act, Pub. L. No. 105-304, § 201, 112 Stat. 2860, 2877 (1998).[1]

The legislative process that preceded the enactment of Title II was initiated by the ISP industry, which at that time—the mid-1990s—was increasingly concerned that traditional doctrines of copyright liability, including the theories of contributory and vicarious infringement, exposed ISPs to liability for the infringing conduct of their customers. *See* H.R. Rep. No. 105-551 (Amended), pt. 1, at 11

---

[1] The DMCA is comprised of five separate titles. Title I of the DMCA implemented the World Intellectual Property Organization Copyright Treaty, which requires contracting parties to "provide adequate legal protection and effective legal remedies" against the circumvention of technological devices employed by copyright owners to protect their works. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001) (quotation omitted). Title III, the "Computer Maintenance Competition Assurance Act," was enacted to "provide a clarifying exemption in the Copyright Act" to allow lawful owners or lessees of computers to authorize independent service technicians to activate their computers in order to service hardware components. S. Rep. No. 105-190, at 2. Title V is separately titled the "Vessel Hull Design Protection Act." Title IV contains "Miscellaneous Provisions."

(1998).  At the instigation of the ISP industry, proposed legislation was introduced in both houses of Congress in the summer of 1997.  Both bills proposed to grant to ISPs broad protection from claims arising from the infringing conduct of their users, and neither imposed any burden on ISPs to help copyright owners identify the ISP customers who were using their Internet connections to steal copyrighted material.  *See The Copyright Infringement Liability of Online and Internet Service Providers: Hearing on S. 1146 Before the Senate Comm. on the Judiciary*, 105th Cong. 45-55 (1997) ("*Hearing on S. 1146*") (proposed legislation); *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and 2280 Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary*, 105th Cong. 22-25 (1997) ("*Hearing on H.R. 2281 and 2280*") (proposed legislation).

Not surprisingly, the ISP industry's proposals met stiff resistance from the software, motion picture, and recording industries, among others, all of whom were suffering, and would continue to suffer, the consequences of Internet copyright theft.  *See Hearing on S. 1146*; *Hearing on H.R. 2281 and 2280.*  While resisting any new laws affecting the liability of ISPs for their customers' infringements, they also directed criticism to particular aspects of the ISPs' proposed legislation, including the absence of any obligation on the ISPs to identify those customers suspected of infringement:

> A matter not now addressed by the bill is disclosure of the
> names and addresses of infringer by the service provider. Often
> in conducting internet anti-piracy cases, we can locate the
> source of the material as a particular site on a service provider's
> system, but because the Internet is essentially an environment
> replete with "aliases," we cannot determine the identity of a
> person. This makes it quite hard to proceed with prosecution,
> and it would be a valuable addition to the approach taken by the
> bill for it to also provide incentives for service providers to
> share information, under appropriate circumstances, about the
> infringer's identity.

*Hearing on H.R. 2281 and 2280,* at 77 (statement of Robert W. Holleyman II, President, Business Software Alliance). Likewise, the Information Industry Association urged Congress to "condition reduced liability for infringement on the access or service provider's willingness to reveal the names of users that violate copyright and to preclude repeat offenders from accessing their services." *Id.* at 177.

During the lengthy Congressional deliberations over this legislation, the ISP industry acknowledged that the task of combating Internet copyright piracy would have to be one of "joint responsibility between copyright owners and ISPs." *Hearing on S. 1146,* at 32 (prepared statement of Roy Neel, President, United States Telephone Association); *Hearing on H.R. 2281 and 2280,* at 89 (same). As this ISP industry representative stated, "When ISPs acquire actual knowledge that their services are being misused for infringing purposes, they should be obligated

to take reasonable steps to halt further abuse." *Hearing on S. 1146,* at 32; *Hearing on H.R. 2281 and 2280,* at 88.

> We believe that the task of ferreting out copyright infringement on the Internet should fall to the copyright owner. Today, copyright owners have access to a large array of Internet search engines and "spiders" to sniff out material they know belongs to them (unlike the ISPs, who cannot be certain who may have recently purchased which copyrighted material). <u>Once the copyright owners discover infringement, they can bring it to the attention of the ISPs. It is at this point that the ISPs can sensibly act</u>.

*Hearing on S. 1146,* at 32; *Hearing on H.R. 2281 and 2280,* at 89 (emphasis added).

What it would mean for ISPs to "sensibly act" in response to evidence that their customers were engaged in copyright infringement was the subject of legislative negotiations "in which representatives of copyright owners and Internet and online service providers sought to resolve the contentious issue of the scope of liability of service providers for the infringing acts of their users." S. Rep. No. 105-190, at 4. The fruits of this negotiation were embodied in Title II of S. 2037, which the Senate passed in May 1998. Section 202 of S. 2037, which is virtually the same as Section 512 as ultimately enacted, includes a provision entitled

"Identification of Direct Infringer" that served the same function as the provision, 17 U.S.C. 512(h), at issue in this litigation.[2] *Id.*

After the Senate adopted the compromise, the House took it up. At House committee hearings, the witness testifying "on behalf of the Ad Hoc Copyright Coalition, which represents thousands of phone companies and other builders of the Internet," applauded the "compromise . . . embodied in Title II of S. 2037," explaining that "the arguments which had previously divided the parties" were resolved after "the content and service provider industries began face-to-face negotiations and were able to approach the remaining key issues with increased knowledge, creativity, and insight." *WIPO Copyright Treaties Implementation Act: Hearing on H.R. 2281 Before the Subcomm. on Telecommunications, Trade and Consumer Protection of the House Comm. on Commerce,* 105th Cong. 50-52 (1998) (*"Hearing on H.R. 2281"*) (remarks and prepared statement of George Vradenburg III, Ad Hoc Copyright Coalition). Although others objected that there was "a significant privacy problem" with the "Identification of Direct Infringer" provision, *id.* at 16 (statement of Marc Rotenberg, Electronic Privacy Information Center) (asserting, among other things, that the provision "grants too much latitude

---

[2] Indeed, although significant amendments were made to nearly every other provision of the Senate-passed bill before the DMCA was finally enacted, Title II of the DMCA embodies the compromise contained in Section 202 of the Senate bill, with only minor changes.

to those who might pursue fishing expeditions"), the ISP industry came out "very much in support" of the legislation. *Id.* at 50-52. The House Committee thereafter accepted the compromise endorsed by the ISP industry, which was virtually identical to Section 202 of the Senate bill, and which was perceived as "preserv[ing] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." *See* H. Rep. No. 105-551, pt. 2, at 49; *see also* S. Rep. No. 105-190, at 20 (intended purpose of Title II was to get ISPs and copyright owners "to cooperate to detect and deal with copyright infringements that take place in the digital networked environment"). The bill passed by the House in August 1998 included the provision titled "Subpoena to Identify Infringer," 144 Cong. Rec. H7074, H7081 (daily ed. Aug. 4, 1998), a provision ultimately included in the statute as enacted and signed by the President.

While commonplace in 1998 when the DMCA was enacted, Internet copyright piracy had not yet reached the "epidemic proportions," *Elcom*, 203 F. Supp. 2d at 1132, that exist now. Nevertheless, that prospect was plainly on the mind of Congress as it was considering the legislation. The motion picture industry, for one, warned that rampant piracy of its product, while not then occurring, was inevitable as technology advanced:

> Movies and videos are not much in evidence yet. That is
> because the audio-visual content is so rich in information

that it cannot yet move easily through the digital network. The volume of flow is simply too great for some of the pipes. But we also know that our present reprieve is only temporary. The same technology that will smooth the way for legitimate delivery of video on demand over digital networks will also prime the pump for copyright pirates.

*Hearing on S. 1146*, at 8–9 (testimony of Fritz Attaway, MPAA Senior Vice President). The head of the Business Software Alliance likewise warned that "[p]iracy of software is a major and growing problem," and warned of the prospect that the Internet could "become a haven for thieves." *Hearing on H.R. 2281*, at 37–40 (testimony of BSA President Holleyman).

This anticipated wave of digital theft has now crashed over the creative industries. It has been facilitated by three developments: (a) the refinement of a technology—"peer-to-peer" file-copying—that was nascent in 1998; (b) substantial advancements in the storage capacity of personal computers; and (c) the widespread availability of high-speed broadband Internet connections. While these technological advancements provide enormous benefits for society, they have also made it more practical for copyright pirates to copy and distribute large files, such as full-length motion pictures. Many broadband users

undoubtedly restrict their activities to lawful pursuits. Unfortunately, others do not.[3]

The perpetrators of this unlawful conduct are exactly the sort of Internet users whose identities were subpoenaed in this case. Under the cloak of anonymity, they utilize "peer-to-peer" file-copying services to offer for downloading copies of the latest and most popular movies, recordings, and software. As Judge Posner described them, these "swappers"—or better yet, "direct infringers"—are "ignorant or more commonly disdainful of copyright and in any event discount the likelihood of being sued or prosecuted for copyright infringement." *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003), *cert. denied*, 124 S. Ct. 1069 (2004).[4] This lawless behavior has flourished notwithstanding a number of successful efforts by the recording and motion picture industries to shut down file-copying services that are not willing or capable of

---

[3] A recent study found that 41% of all broadband Internet users had downloaded music over the Internet; the same study found that 67% of Internet users who download music "do not care about whether the music they have downloaded is copyrighted." Memorandum from Mary Madden and Amanda Lenhart, *Music Downloading, File-sharing, and Copyright: A Pew Internet Project Data Memo*, 1, 5 (July 31, 2003), *available at* http://www.pewinternet.org/reports/pdfs/PIP_Copyright_Memo.pdf.

[4] *See also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("[A] majority of Napster users use the service to download and upload copyrighted music . . . [which] constitute[s] direct infringement. . . ." (quotation omitted)); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*, 259 F. Supp. 2d 1029, 1034 (C.D. Cal. 2003) ("[I]t is undisputed that at least some of the individuals who use Defendants' software are engaged in direct copyright infringement of Plaintiffs copyrighted works").

operating lawfully.  *See id; also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,

1013–19 (9th Cir. 2001).[5]  Indeed, new-and-improved file-copying services

proliferate, and in some instances incorporate innovations that "have been designed

specifically to increase the efficiency and speed of transfer for large files such as

movie files."[6]  The company that provides the KaZaa file-copying service

announced that as of last May, over 230 million copies of its software had been

downloaded, making it (according to the company) the most popular free program

on the Internet.[7]

Not surprisingly, the business of supplying high-speed Internet

connections has mushroomed as well.  According to one recent study, the number

of Americans who access the Internet from home via a broadband Internet

connection grew 50 percent from March 2002 through March 2003 and has

doubled since year-end 2001.[8]  In this face of this extraordinary business

---

[5] *But see Grokster*, 259 F. Supp. 2d 1029 (granting summary judgment to two file-copying services on claims of contributory and vicarious infringement).  This action brought by the member companies of the MPAA and the RIAA is on appeal to the United States Court of Appeals for the Ninth Circuit.

[6] John Borland, *File swapping shifts up a gear*, CNETNews.com, May 27, 2003, *available at* http://news.com.com/2100-1026-1009742.html (file-copying innovation reaching "critical mass").

[7] *See* Press Release, Kazaa, *Kazaa Media Desktop sets most downloaded software record*, (May 26, 2003), *available at* http://www.kazaa.com/us/news/most_downloaded.htm (May 26, 2003).

[8] *See* Memorandum from John B. Horrigan, *Adoption of Broadband to the Home: A Pew Internet Project Data Memo*, 1 (May 18, 2003), *available at* http://www.pewinternet.org/reports/pdfs/PIP_Broadband_adoption.pdf; Mary

opportunity, many in the ISP industry have revised their view of what it means to "act sensibly" in the face of the massive Internet piracy ravaging the creative industries. In 1997 and 1998, when ISPs were pressing for statutory limitations on their own liability, "acting sensibly" meant that they would assist copyright owners in identifying ISP customers engaged in copyright piracy. *See supra* pp. 11-12. Now, however, many ISPs have found it more sensible to dishonor this commitment and instead find ways to capitalize on and profit from the Internet piracy problem.[9]

## II. COPYRIGHT INFRINGERS WHO UTILIZE PEER-TO-PEER SYSTEMS ARE SUBJECT TO SECTION 512(H) SUBPOENAS.

Charter and its *amici* propose a construction of Section 512(h) that disowns the statutory compromise described above and that renders the "subpoena to identify infringer" virtually useless for its intended purpose.

Under this proposed construction, a copyright owner may obtain a "subpoena to identify infringer" only where the ISP customer suspected of infringement stores pirated works on the ISP's computer network. Charter and its

---

Madden, *America's Online Pursuits: The Changing Picture of Who's Online and What They Do*, 3 (Dec. 22, 2003), *available at* http://www.pewinternet.org/reports/pdfs/PIP_Online_Pursuits_Final.PDF.

[9] To give one example, one Senator sharply criticized Verizon Internet Services for distributing marketing materials to its broadband customers suggesting that they bypass the licensed "official sites" that offer music downloads legally, and instead patronize the "free sites"—specifically noting that the "free sites are likely to have pretty much everything." Roy Mark, *Boxer Blasts Verizon's DMCA Stance*, September 17, 2003, *available at* http://dc.internet.com/news/article.php/3079141.

*amici* argue that the subpoena should be unavailable in the circumstances where the District Court permitted its use—*i.e.,* to identify ISP customers who distribute copyrighted works from their personal computer hard drives via KaZaa or one of the other popular "peer-to-peer" file-copying services. Considering that "swapping" of copyrighted works over "peer-to-peer" services is by far the predominant form of Internet copyright infringement, construing Section 512(h) in this limited manner would provide a safe haven for the vast majority of Internet pirates. And this construction of Section 512(h) would for all practical purposes relieve ISPs of their obligation to assist anti-piracy efforts through the identification of customers suspected of infringement.

Charter and its *amici* draw support for their argument from *Recording Industry Ass'n of America v. Verizon Internet Services, Inc.*, 351 F.3d 1229 (D.C. Cir. 2003). But for all the reasons stated by the RIAA in its brief, the D.C. Circuit's *Verizon* ruling is seriously flawed, particularly in its observation that "the legislative history of the DMCA betrays no awareness whatsoever that internet users might be able directly to exchange files containing copyrighted works." *Verizon*, 351 F.3d at 1238. In fact, as the RIAA's brief demonstrates, there is abundant legislative history demonstrating that precisely this concern was on the minds of copyright owners and Congress. *See* RIAA Br. at 5-10.

The Court should be guided not by *Verizon*, but instead by the two thorough and well-reasoned district court opinions that the D.C. Circuit reversed, in which Judge Bates explained—through analysis of the text of Section 512 as well as its legislative history—how Congress granted copyright owners the right to learn the identity of infringers now and in the future in exchange for the ISP industry's requested limitations on liability for the infringements of their customers. *See In re Verizon Internet Servs., Inc.,* 240 F. Supp. 2d 24, 35 (D.D.C. 2003) ("*Verizon I*"); *In re Verizon Internet Servs., Inc.,* 257 F. Supp. 2d 244, 265 (D.D.C. 2003) ("*Verizon II*"). As Judge Bates observed, interpreting Section 512(h) as inapplicable to "peer-to-peer" infringers like those at issue in this case "would create a huge loophole in Congress's effort to prevent copyright infringement on the Internet" and would "allow infringement to flourish." 240 F. Supp. 2d at 35-36.

Indeed, under Charter and its *amici*'s construction of the statute, pirates could only be unmasked through a Section 512(h) subpoena only in instances where copyright owners would already have alternative remedies against infringement—*i.e.*, demanding that ISPs remove the infringing materials from the ISP network, pursuant to 17 U.S.C. §§ 512(b)-(d). When that remedy is unavailable—that is, when the infringed work is <u>not</u> on the ISP's network—is precisely when copyright owners need the Section 512(h) subpoena most of all, for

without it their ability to expeditiously combat anonymous piracy is greatly limited. How can a copyright owner quickly stop an anonymous pirate from distributing a valuable new work when the copyright owner does not know who that person is?

Charter and its *amici* do not dispute that the 93 individuals whose identities the RIAA sought were engaged in large-scale infringement activities. Nor is there any dispute that the only reliable way for one of the aggrieved copyright owners to secure their identities is for Charter to disclose it. Charter in turn has not claimed (and could not claim) that identifying a particular customer engaged in "peer-to-peer" infringement is any more burdensome than identifying customers suspected of infringement by other means. And, of course, the injury for which Congress was providing a remedy—Internet copyright piracy—is the same regardless of whether the infringer utilizes a "peer-to-peer" service or distributes unauthorized digital copies over the Internet some other way. Courts disfavor any construction of a statute that provides "absurd results." *Rowley v. Yarnall*, 22 F.3d 190, 192 (8th Cir. 1994) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982)); *see also Monahan v. Flannery*, 755 F.2d 678, 682-83 (8th Cir. 1985). Yet that is precisely what Charter and its *amici* have proposed.

## III. CONGRESS WAS ENTITLED TO BALANCE, AND PROPERLY BALANCED, THE COMPETING INTERESTS OF INTERNET USERS AND COPYRIGHT OWNERS.

Among their constitutional arguments, Charter and its supporting *amici* contend that Section 512(h) is unconstitutional because it fails to accommodate interests protected by the First Amendment. Charter Br. at 39-43; Consumer and Privacy *Amici* Br. at 12-22. This has the statute exactly backward. The DMCA generally, and Section 512(h) in particular, were intended by Congress to *promote* First Amendment interests and do just that.

Congress and the courts have long recognized that free expression cannot thrive without effective protection for copyrighted works. Copyright law provides an incentive to authors, composers, software writers, artists, and others to invest their time and efforts in the development of new works, secure in the knowledge that they will maintain control over and reap the rewards of their creative labors for a reasonable period. These rewards, in turn, benefit the public by encouraging the continued creation and dissemination of original expression. "[I]t should not be forgotten that the Framers intended copyright itself to be the engine of free expression." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

> By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas. . . . "The economic philosophy behind the clause empowering Congress to grant patents and

> copyrights is the conviction that encouragement of individual
> effort by personal gain is the best way to advance public
> welfare through the talents of authors and inventors in 'Science
> and useful Arts.'"

*Id.* (quoting *Mazer v. Stein*, 347 U.S. 201, 219 (1954)). The impact this principle

had on Congress is evidenced in abundance throughout the DMCA's legislative

history.[10] Congress recognized that without some assurances to the creative

community that their own anti-piracy efforts would be given some legal teeth,

society will be deprived the myriad benefits that accompany the distribution of

copyrighted works in digital form.

By comparison, it is a stretch to assert that the "anonymous speech"

rights of Internet users even attach in the context of a Section 512(h) subpoena. As

the Supreme Court's decision in *Watchtower Bible & Tract Society of New York,*

*Inc. v. Village of Stratton*, 536 U.S. 150, 166 (2002) makes clear, the purpose of the

"anonymous speech" doctrine is to protect those "who support causes

anonymously" from "fear of economic or official retaliation," "social ostracism,"

or an unwanted intrusion into "privacy." *Id*. at 166 (quotations omitted). No case

is cited suggesting that the "anonymous speech" doctrine creates presumptions and

protections in the face of a substantial allegation of infringement. Charter and its

---

[10] *See, e.g.*, H.R. Rep. No. 105-551, pt. 2, at 23 (1998); *see also* 144 Cong. Rec. S4884 (daily ed. May 14, 1998) (statements of Sen. Hatch); S. Rep. No. 105-190, at 8 (1998); 144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998) (statements of Rep. Frank).

*amici* do not argue that the Internet users in this case are engaged in anything remotely resembling expressive conduct, nor could they—infringers, after all, do not create speech, they copy it. Nor could the argument be advanced with regard to the millions of ISP customers whose only conduct is allowing others access to their computer hard drives to copy valuable intellectual property owned by someone else. "[T]he First Amendment 'bears less heavily when speakers assert the right to make other people's speeches.' *Eldred v. Ashcroft*, 537 U.S. 186 [, 221] (2003). Or, we add, to copy or to enable the copying, of other people's music." *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) (citation omitted).

Even so, Congress in enacting Section 512(h) hardly gave short shrift to the interests of Internet users. Congress did not establish a regime whereby copyright owners are entitled to obtain an Internet user's identity just by demanding it. As explained by the district court in *Verizon,* the only court to date that has considered this constitutional challenge, Section 512(h) contains "provisions [that] provide substantial protection for Internet users against baseless or abusive subpoenas." *Verizon II*, 257 F. Supp. 2d at 263.[11] The subpoena applicant must submit a notification that is the substantial equivalent of a copyright infringement complaint, and must also submit a declaration sworn under penalty of

_____

[11] Judge Bates's analysis of Verizon's constitutional challenges to Section 512 was not reversed by the D.C. Circuit. *See Verizon*, 351 F.3d at 1231.

perjury that the sole purpose for requesting the subpoena is to identify a suspected

infringer and that the information "will only be used for the purpose of protecting

rights under this title [*i.e.*, Title 17]." 17 U.S.C. § 512(h)(2)(c) (2000).[12]

Furthermore, the protections of Federal Rule of Civil Procedure 45, apply. *Id.*

§ 512(h)(6).  Thus, unless court clerks start accepting "sworn declarations"

executed by computers rather than humans, the risk of "mistake and misuse" of

Section 512(h) resulting from "bot-generated subpoenas," Consumer and Privacy

*Amici* Br. at 8, will never occur.[13]

Nonetheless, Charter advocates limiting copyright owners' options in

combating piracy to the filing of "John Doe" lawsuits or resorting to warning users

by entering and participating in Internet "chat" rooms.  Charter Br. at 43.  While

these alternatives are open to and utilized by copyright owners, imposing them by

judicial order would simply supplant Congress' considered judgment that the

---

[12] Charter's *amici*'s suggestion that "all that is needed" for issuance of Section 512(h) subpoena "is a 'good faith' assertion of copyright infringement by the subpoenaing party," Consumer and Privacy *Amici* Br. at 1, is entirely mistaken.

[13] Charter's *amici* state that some copyright owners have served ISPs with a large number of computer-generated notices of websites engaged in infringement. Consumer and Privacy *Amici* Br. at 8.  But that is precisely what the ISPs expected when the DMCA was drafted and exactly the compromise Congress contemplated in the *quid pro quo* scheme that Congress adopted in Section 512.  In urging Congress to impose on copyright owners "the task of ferreting out copyright infringement on the Internet," the ISP representative noted the availability of software (then called "spiders," now called "bots") to perform this task. *Hearing on S. 1146,* at 32; *Hearing on H.R. 2281 and 2280,* at 89 (statement of Mr. Neel of the United States Telephone Association).  The large number of notices served is a testament to the extent of the piracy epidemic and the persistence and scope of the creative industries' anti-piracy efforts.

Section 512(h) subpoena is an additional, necessary option in the battle against copyright piracy.  Charter's *amici* also propose that, as an alternative to invalidation of Section 512(h), the Court graft additional procedures onto Section 512(h)—specifically, requiring that an Internet user receive advance notice of a subpoena seeking his or her identity, an opportunity to oppose it anonymously, the filing of a complaint or pleading containing information redundant to that already required by Section 512(h), and a judicial review of the merits of a proposed copyright infringement claim—all *before* the user's identity may be disclosed. Consumer and Privacy *Amici* Br. at 17-18.

Of course, the imposition of a court-imposed series of additional procedures would inevitably result in delay, and that in turn would result in substantial damage to the copyright owners whom Congress intended the subpoena provision to aid.  In three separate places Congress directed that Section 512(h) subpoenas be issued and responded to "expeditiously."  17 U.S.C. § 512(h)(3)-(5). Congress had good reason for doing so.  As the district court in *Verizon* recognized, delay in obtaining a Section 512(h) subpoena could be catastrophic for a motion picture studio that discovered pirated copies on the Internet of an expensive new release—without the ability to identify the suspected infringers immediately, "the movie could be distributed all over the world in the meantime, dramatically diminishing the value of the copyright."  *Verizon I*, 240 F. Supp. 2d at 35 n.7.

Indeed, the plain purpose of the subpoena was to allow victimized copyright owners to obtain the identifying information more quickly than would be possible through bringing a lawsuit.

As for the misuses of the subpoena provision that Charter and its *amici* predict, Charter Br. at 46, Consumer and Privacy *Amici* Br. at 9-10, the absence of any substantial evidence that this has occurred in the five years since the statute was enacted strongly suggests that the hypothesized scenarios—*e.g.*, utilizing Section 512(h) to learn the identity of the quintessential "anonymous pamphleteer" or abuse of the subpoena by pornographers—are highly unlikely. *Verizon II*, 257 F. Supp. 2d at 264-65. Moreover, Charter's *amici*'s recitation of past erroneous complaints by copyright owners—small in number to begin with relative to the magnitude of the Internet piracy problem—are inapposite in the present case. *See* Consumer and Privacy *Amici* Br. at 5-8. Like the "Harry Potter" incident noted by Charter's *amici*, most of these examples involve notices that were served pursuant to Section 512(c)(3) requesting that an ISP remove material located on its servers. *See Verizon II*, 257 F. Supp. 2d at 264 n.23. Unlike Section 512(h), in this other procedure the Internet user's identity is <u>not</u> disclosed to the complaining party.

The remoteness of these perceived threats and absence of evidence of the abuses Charter and its *amici* foretell alone defeat this constitutional challenge.

*Id*. at 265-66. "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984); *see also Ashcroft v. ACLU*, 535 U.S. 564, 584 (2002) ("[T]he overbreadth of a statute must not only be real, but substantial as well." (quotation omitted)). And even if anecdotal evidence could be presented, that would not be grounds for invalidating a remedial statute directed towards the millions of copyright infringements that occur each day on "peer-to-peer" systems; "[j]udged in relation to the statute's plainly legitimate sweep, and in light of the extent of copyright piracy over the Internet, any impact on expressive and associational rights on the Internet is negligible." *Verizon II*, 257 F. Supp. 2d at 266 (internal quotation omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989).

Thus, whatever presumption of constitutionality attaches to the conduct of these Internet users to whom Section 512(h) subpoenas are directed, no less weighty a presumption attaches to the interests of the copyright owners

utilizing that statute in their anti-piracy efforts. *Amici* submit that Congress in

crafting Section 512(h) gave proper consideration to these respective interests, but

at the end of the day, it is not a judicial function to supplant that balancing with the

Court's own. As the Supreme Court has repeatedly held, courts "are not at liberty

to second-guess congressional determinations and policy judgments" regarding

copyright policy, as "it is generally for Congress, not the courts, to decide how best

to pursue the Copyright Clause's objectives." *Eldred v. Ashcroft*, 537 U.S. 186,

208, 212 (2003).[14]

---

[14] If Section 512(h) were struck down on constitutional grounds, all of Section 512—including the limitations on ISP liability in §§ 512(a)-(d) —would have to be struck down as well. Where Congress has, as here, balanced two goals in enacting a statute, invalidating a provision that advances one of those goals necessarily upsets the legislative balance and precludes severing of the statute. The structure, language, and legislative history of the "Online Copyright Infringement Liability Limitation Act" mark Title II of the DMCA as a classic example of compromise legislation, *see, e.g., Verizon I*, 240 F. Supp. 2d at 36–38. Accordingly, all of Section 512—*i.e.*, the liability limitation on ISPs as well as the subpoena provision—should properly be viewed as one provision. *See, e.g., Am. Fed. of Gov't Employees v. Pierce,* 697 F.2d 303, 306–07 (D.C. Cir. 1982) (finding against severability in compromise legislation). The limited burden of helping copyright owners identify anonymous infringers was the "consideration" the ISP industry offered in return for the liability limitations the ISPs requested. Congress declined to act on the more one-sided bills originally proposed by the ISPs, and instead enacted the compromise statute that both provided benefits and imposed corresponding burdens on the ISPs. This compromise provision was maintained intact throughout the remainder of the legislative process, even while different provisions that became other titles of the DMCA were undergoing significant alteration. This history strongly suggests that a liability limitation statute for ISPs that lacked any corresponding obligation to assist in identifying infringers is "legislation that Congress would not have enacted" and that thus the "traditional" test for severability is not satisfied here. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987); *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001), *cert. denied*, 535 U.S. 986 (2002).

## CONCLUSION

In the DMCA Congress, after years of considering the competing issues involved, took on the latest threat to copyright—balancing the tremendous benefits of the Internet and digital technology against the very significant risks they pose to the intellectual property of present and future copyright owners. One cannot find in Title II the purported right to anonymity that Charter invokes on behalf of the serial infringers at issue in this proceeding, and the others who are similarly inflicting massive injury on copyright owners. For the reasons set forth above, the Court should decline the invitation to create such a right, affirm the District Court, and hold that the Section 512(h) "subpoena to identify infringer" was properly served on Charter to learn the identity of the ISP customers at issue in this appeal.

# <u>FED. R. APP. P. 32(a)(7)(C) CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies that this brief complies with Federal Rules of Appellate Procedure 29(c) and 32.  The brief contains 6,895 words, excluding the portions of the brief exempted.  The brief is printed using 14-point Times New Roman font and was prepared using Microsoft Word 97.  *Amici* have also submitted to the Court a virus free 3.5" floppy disk containing a copy of this brief in PDF form as required by Eight Circuit Rule 28A(d).

                                      _____

                                        Manish K. Mital

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused true and correct copies of the foregoing BRIEF OF *AMICI CURIAE* IN SUPPORT OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA to be served by first-class mail on this 4th day of March, 2004, upon the following:

Donald B. Verrilli, Jr.
Thomas J. Perrelli
Steven B. Fabrizio
JENNER & BLOCK
601 Thirteenth Street, N.W.
Suite 1200
Washington, D.C.  20005

Matthew J. Oppenheim
Stanley Pierre-Louis
RECORDING INDUSTRY
ASSOCIATION OF AMERICA
1330 Connecticut Ave., N.W., Suite 300
Washington, D.C.  20036

Thomas C. Walsh
K. Lee Marshall
BRYAN CAVE, LLP
One Metropolitan Square
211 North Broadway Square
St. Louis, MO  63102

Paul Glist
John D. Seiver
Geoffrey C. Cook
COLE, RAYWID & BRAVERMAN, LLP
1919 Pennsylvania Ave., N.W.
Washington, D.C.  20006

Stephen B. Higgins
Mark Sableman
James W. Erwin
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO  63101

Yvette Molinaro
Patricia H. Benson
MITCHELL SILBERBERG & KNUPP LLP
Trident Center
111977 West Olympic Blvd.
Los Angeles, CA  90064

Alan Untereiner
Kathryn S. Zecca
Brian Willen
Alison C. Barnes
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, N.W., Suite 411
Washington, D.C.  20006

Christopher A. Hansen
Aden J. Fine
AMERICAN CIVIL LIBERTIES
UNION
125 Broad Street, 18th Floor
New York, NY  10004

Douglas N. Letter
Scott R. McIntosh
DEPARTMENT OF JUSTICE
Civil Division
601 D Street, N.W.
Room 9554
Washington, DC  20530

Cindy A. Cohen
Wendy M. Seltzer
ELECTRONIC FRONTEIR
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110

Jeffrey R. Bragalone
Mathew P. Harper
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201

_____
Manish K. Mital